UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CHARLES WILLIAMS

        Plaintiff

                                          Docket No. 07 cv 7720
                                          (CM) (RLE)

        -against-

                                          **AFFIDAVIT**

PALLADIA, INC. and CORINE WORKMAN

        Defendants
------------------------------------------------------------x
STATE OF NEW YORK      )
                              )ss.:
COUNTY OF NEW YORK  )

        Corinne Workman being duly sworn deposes and says:

        1.     I am an African American woman and am the individual defendant herein, sued as Corine Workman. As such I am fully familiar with the facts and circumstances of this matter and submit this affidavit in support of defendants' motion for summary judgment seeking dismissal of the Complaint in this action.

        2.     Within, Charles Williams, alleges that he was terminated by me because he was a man and that I have an animus towards men. Nothing could be further from the truth. Both the testimonial and documentary evidence will clearly show that Mr. Williams' case rests solely upon conclusory assertions and speculation unsupported by any evidence.

        3.     I hired Mr. Williams in October, 2005, and I terminated him for cause one year later. His termination had nothing to do with his sex or the fact that he

80048833.5                                      1

was a man. I never harassed him at any time or for any reason let alone because of he was a man.

4. Not only don't I have an animus toward men but, as the evidence will clearly show, over the years the overwhelming majority of employees that I hire for the House Monitor position, the same position that Mr. Williams had, were and are men.

5. Moreover, contrary to his allegation that I fired him to replace him with a woman, he was actually replaced by a man, Nigel Garrett, who still works for Palladia and who was interviewed and hired by me.

6. Simply put, Mr. Williams has no case and no facts to back up any of his allegations. Accordingly, this motion should be granted in its entirety and the Complaint dismissed.

## BACKGROUND FACTS

7. Palladia, established in 1970, is a not-for-profit corporation which offers a continuum of care to men and women recovering from substance abuse, co-occurring disorders and trauma. To end the cycle of poverty and chemical dependence, Palladia has a range of quality services in its outpatient and residential programs: domestic violence and trauma treatment, HIV/AIDS services, primary care, alternative criminal justice rehabilitation, vocational training and placement, family reunification, mental health and supportive, permanent housing. Copies of documentation regarding Palladia are annexed as Exhibit "H".

8. I was, during Mr. Williams's employment, and still am the Program Director of defendant Palladia, Inc.' ("Palladia") facilities known as Dreitzer House, Flora Vista and Chelsea Court.

80048833.5                                    2

9. Dreitzer House ("Dreitzer"), located in East Harlem is a supported living facility with one to three-bedroom apartments and is a permanent home for 36 families. In addition to housing residents receive case management support services.

10. Flora Vista, also located in East Harlem, and right across from Dreitzer, is a six story building housing previously homeless and at-risk individuals. Tenants are offered long-awaited stability, security and support with full access to on-site case management and support services.

11. Chelsea Court, located in the Chelsea area of Manhattan is an 18-unit permanent housing project providing studio apartments for previously homeless individuals.

12. In or about September 15, 2005, Mr. Williams applied for a House Monitor position with Palladia. A copy of his application letter is annexed as Exhibit "I".

13. Mr. Williams was initially interviewed by Doretha Gilmore, the administrative assistant at the three facilities. He was then interviewed by me.

14. I made the decision to hire him as a full time House Monitor to work the 12:00 a.m. to 8:00 a.m. shift at Dreitzer at an annual salary of $22,000.00 per year. This decision was approved by Lana Hallstein, Palladia's Senior Director for Program Services Housing, and my boss. A copy of the Personal Requisition showing the hiring is annexed as Exhibit "J".

15. At the time he was hired Mr. Williams received a copy of Palladia's Personnel Policy Manual and executed a document indicating that "I have read and fully understand the Personnel Policies of Palladia, Inc. I understand that if at any time I violate any of these policies, it will lead to my immediate termination." A copy of

that document signed by Mr. Williams is annexed as Exhibit "K".

16. Mr. Williams began working on or about October 17, 20045 on the 12:00 a.m. to 8:00 a.m. shift at Dreitzer manning the front desk at the building's main entrance and providing security for the tenants by making two security sweeps of the building, one during the first half of his shift and the other during the second. These sweeps require him to ride the elevators from the top to the bottom floor, stopping on every floor and looking out into the hallways. A copy of the House Monitor job description is annexed as Exhibit "L". He was permitted a one hour lunch break during his shift.

**Mr. Williams Work History:**

17. I am advised by my counsel, that Mr. Williams filed a Complaint of Discrimination with the New York State Division of Human Rights (the "State Division") alleging that he was terminated because I have an animus towards men and wanted to replace him with a woman. ( Exhibit "E")

18. Contrary to the representation made in his Complaint of Discrimination (the "State Division Complaint"), that his time, attendance and work performance were always satisfactory Mr. Williams had been disciplined twice and had previously been suspended for one day although his general performance was good.

19. On June 27, 2006, after receiving a complaint from the Social Worker at Dreitzer, Mr. Williams was advised that he was not to use the desk in the Social Work office as the Social Worker was complaining that she was finding his property on her desk. He was also advised that his lunch break hours were from 3:30 a.m. to 4:30 a.m. and he was to take this time in the Activity Room. Moreover, other than

when he would make runs (a security sweep of the premises) he was expected to be at the Front Desk at Dreitzer at all times. A copy of the letter to Mr. Williams related to the above incident is annexed as Exhibit "M".

20. On July 1st 2006, I was informed that Mr. Williams called the administrative assistant at Dreitzer, Doretha Gilmore, advising her that he would not be at work that day as he was stuck in South Jersey and could not get back to cover his shift.

21. Mr. Williams had previously requested that day off but had been denied permission because a conflict in scheduling would have resulted in a lack of coverage. Mr. Williams admitted that he was aware that he did not have permission to take that day off, but was in South Jersey and allegedly he could not come back (Tr. 67)(Exhibit "AI"). This caused Palladia numerous problems because it was required to seek a replacement for Mr. Williams from an outside security agency.

22. Mr. Williams was suspended for one day, July 11, 2006. A copy of the Employee Performance Discussion memorializing this incident is annexed as Exhibit "N".

**The October 31, 2006 incident:**

23. On Tuesday, October 31, 2006 Mr. Williams was scheduled to work the 12:00 a.m. to 8:00 a.m. shift at Dreitzer. According, to the time sheet and communications log[1] he came on duty at 12:00 a.m.

24. In addition to having a House Monitor at Dreitzer, because of staffing issues, Palladia retained a security service "Front Line Security" to provide

---

[1] The terms "communications log" and "security book" are used interchangeably by Palladia employees and refer to the same document.

80048833.5

5

security at Flora Vista. That night Lizzette Danowsky, an employee of Palladia, who also worked for First Line was scheduled to be on duty at Flora Vista for the 12 a.m. to 8 a.m. shift. Flora Vista is located directly across from Dreitzer and separated by a yard. The person working security at Flora Vista has to pick up the keys to the building at Dreitzer.

25. I was later advised that at approximately 12:20 a.m. Ms. Danowsky went over to Dreitzer to pick up the keys. She noticed that Mr. Williams was not sitting at the security desk although he was supposedly on duty. She waited a few minutes and checked the security book observing that Mr. Williams had signed in as "on duty" at 12:00 a.m. A copy of the appropriate page of the security log book for October 31, 2006 is annexed as Exhibit "O".

26. Seeing no one Ms. Danowsky signed the security log at 12:20 a.m. that she was on site and that "nobody @ D.H building was secure – quiet."

27. At 1:00 a.m. Ms. Danowsky performed a security sweep at Dreitzer checking all of the floors, bathrooms, staff offices and stairwell and could not find any sign of Mr. Williams.

28. According to both Ms. Danowsky and Ms. Gilmore,[2] at that point Ms. Danowsky called Doretha Gilmore and advised her that Mr. Williams was not present and that Ms. Danowsky was unable to reach him on his cell phone. Ms. Gilmore directed Ms. Danowsky to stay at Dreitzer and recheck the facility and to have Mr. Williams call her when he returned to the building. At about 2:00 a.m. Ms. Danowsky again checked the entire building and while not encountering Mr. Williams did see his back pack in one of the rooms.

---

[2] See annexed affidavits of Lizzette Danowsky and Doretha Gilmore.

29. According to Ms. Danowsky, Mr. Williams entered the building at 3:42 a.m. Ms. Danowsky advised him to call Ms. Gilmore.

30. Ms. Danowsky memorialized the incident in a memorandum, dated November 3, 2006. (See Exhibit "AW")

31. When I arrived at work that morning I had a voice mail message from Doretha Gilmore regarding the issues with Mr. Williams that night. Upon reviewing the security log later that day I discovered that the security log had been changed where Ms. Danowsky had indicated that she entered Dreitzer at 12:20 – the log had been altered to show 1:00.

32. That day I and another employee left a message for Mr. Williams to come see me. He did not show up. When he finally called me he told me that he didn't like the way I left instructions for him. I therefore suggested that he go speak to someone in personnel.

33. Leaving his post as House Monitor is a very serious matter as it leaves the facility with no security and no one at the front desk if there is an emergency. Moreover, falsifying records is something that cannot be tolerated.

**The Falsified Time Sheet:**

34. That next day upon checking Mr. Williams' time sign in sheets, I noticed that he had already signed in for the night of November 1st, although he had been informed when he arrived that he was not to work that night and to go to human resources that next day.

35. A review of the time sheet shows that Mr. Williams had signed in for both Tuesday, October 31st (the night he left the facility) and the next day,

Wednesday, November 1st a day he had not as yet worked. A copy of the falsified time sheet is annexed as Exhibit "P".

36. At his deposition[3] Mr. Williams admitted that he did not work on Wednesday night November 1st. He stated that he came in at 12:00 and was asked to leave. However, his time sheet for that night shows start work at 12:00, lunch from 3:00 to 4:00 and leave at 8:00 a.m. Moreover, he admitted that although he didn't remember filling in the time sheet for November 1st, the entry was in his handwriting and that he did not work his shift that day. (Tr. p. 142-144) (Exhibit "AM").

37. Accordingly, I recommended to George Lino, Sr. Director of Human Resources, that Mr. Williams be terminated. A copy of that recommendation is annexed as Exhibit "Q".

38. Mr. Williams termination was approved by Mr. Lino, who is no longer with Palladia. A copy of his termination letter is annexed as Exhibit "R."

39. The termination was pursuant to Palladia's Employee Manual which states that failure to comply with sign in procedures or falsification of timesheets is grounds for termination or immediate dismissal. A copy of Section 12.2(e) of Palladia's Employee Manual is annexed as Exhibit "S".

40. Subsequent to his termination Mr. Williams, by letter dated November 10, 2006, addressed to Mr. Lino, denied that he had falsified time sheets or any other documents and requested a hearing. A copy of the letter is annexed as Exhibit "T".

41. By letter dated November 16, 2006, Mr. Lino, who is an African

---

[3]. I was present throughout Mr. Williams' deposition and heard his entire testimony.

American male, advised Mr. Williams that he had reviewed the claim and found that "the information provided and the documents support the justification for your termination. " A copy of the letter is annexed as Exhibit "U".

**The Complaint In the Instant Action:**

42. I am named as a defendant in the Complaint (Exhibit "A") in this action which alleges that I harassed and terminated Mr. Williams because he was a man.

43. In paragraph 8 of his Complaint Mr. Williams alleges that:

> I was terminated from my place of employment, Palladia Inc. on October 30, 2006. This was an unlawful and discriminating act by Palladia. This act was committed by Corine Workman, who had been harassing me because of my gender and my race. Corine coerced other female employees to lie about the incident.
>
> It is Ms. Workman's claim that I falsified documents. This is untrue. I was in the process of trying to negotiate a raise after being employed at the company for more than 12 months. The result of this request were increase harassment and my termination based upon erroneous information.

44. I am advised by my attorneys that the claims of "racial" discrimination "retaliation" and "other acts" have been dismissed by the Court (Exhibit "C").

**Response to Allegations:**

45. Mr. Williams' termination was warranted and as the evidence will clearly show, I do not harbor any animus towards men. Nor do I predicate any employment actions based upon an employee's sex. I also dispute that I coerced any other female employee to lie or that his termination was in any way related to a request for a raise.

80048833.5                                9

46. I am advised by my attorneys that for the Court to grant summary judgment there must be no material issues of fact. Although Mr. Williams makes all of these allegations they are solely based upon his conclusions and suppositions and unsupported by any evidence.

47. To the contrary all of the evidence supports Mr. Williams' being terminated for cause and not for any other reason.

**Hiring of Men:**

48. The essence of the Complaint is that I have an animus towards men. This is totally untrue and unsupported by any evidence. To the contrary the uncontested evidence is that I repeatedly hire men for the House Monitor position. Indeed, because of the nature of the job the overwhelming majority of applicants for the position are men.

49. At present there are eight House Monitors between the three facilities all of which are men. Roscoe Clark (Chelsea Court); Sam Dennis (Chelsea – part time); Nigal Garret (Dreitzer) Robert Matthews (Chelsea Court); Claude Nelson (Flora Vista); John Pegram (Chelsea Court – part time); Kurtis Spivey (Flora Vista), Tagquan Travis (Dreitzer- part time). All were interviewed and hired by me.

50. In fact, Nigel Garret, one of the House Monitors at Dreitzer, was hired as Mr. Williams' replacement upon his termination.

51. The allegations raised by Mr. Williams regarding terminations and transfers of unnamed employees in his State Division Complaint are equally unavailing. The facts relating to the hiring, transfer or termination of the following employees are set forth below.

80048833.5

10

**Sim Hartfield:**

52.  Mr. Hartfield was hired by Palladia in April, 2005, as the House Monitor at Dreitzer. I interviewed and hired Mr. Hartfield.

53.  Mr. Hartfield was terminated by me in September 2005, for poor work performance during his probationary period. A copy of my termination recommendation is annexed as Exhibit "V" and a copy of Mr. Hartfield's termination letter is annexed as Exhibit "W".

54.  Mr. Hartfield was replaced by the plaintiff, Charles Williams.

**Ramon Luna:**

55.  Ramon Luna worked part time at Dreitzer as a House Monitor beginning, October 2005. He was interviewed and hired by me.

56.  He requested a full time position. Accordingly, in February, 2006, I transferred him to Chelsea Court as a full time House Monitor.

57.  On June 5, 2006, an unidentified woman called Palladia advising that Mr. Luna had left the country as a result of his father's death and that he had to fly to the Dominican Republic. By June 14, 2006, Mr. Luna had not returned to work nor had he communicated with Palladia. By letter dated June 14th, (Exhibit "X") he was advised that if Palladia did not hear from him by June 16th, he would be considered as having "abandoned" his position and would be terminated pursuant to Section 6.4 of Palladia's Employee Manual.

58.  As Palladia did not hear from Mr. Luna he was terminated for job abandonment. Annexed as Exhibit "Y" is a copy of the letter of termination and as Exhibit "Z" is a copy of Section 6.4 of Palladia's Employee Manual.

**Michael Williams:**

59.  Mr. Williams, was hired in October, 2005 as a part time House Monitor at Dreitzer. H was interviewed and hired by me. In or about May 1, 2006, at his request I transferred him to a full time position at Chelsea Court.

60.  Pursuant to Section 4.3 of Palladia's Personnel Manual all new and present employees that are transferred to a new position have a six month probationary period. A copy of Section 4.3 is annexed as Exhibit "AA".

61.  On August 30th and 31st during his probationary period, Mr. Williams failed to report for work without notifying his supervisor causing other staff to have to cover for him. A copy of my e-mail to George Lino and Lana Holstein regarding this is annexed as Exhibit "AB".

Section 12.2 (f) of Palladia's Personnel Manual states that

Any/All of the following activities may be grounds for termination or immediate dismissal:

(f) Failure to report to work as scheduled without notification to the Supervisor/Director ("nocall/noshow").

62.  A copy of section 12.2 is annexed as Exhibit "AC".

63.  Accordingly, by letter dated September 5, 2006, Mr. Williams was advised that he was being terminated effective August 29, 2007. A copy of his termination letter is annexed as Exhibit "AD".

**Harry Pharr:**

64.  Mr. Pharr, replaced Roscoe Clark at Dreitzer after Mr. Clark was transferred to a full time position at Chelsea Court. He was interviewed and hired by me.

65. Mr. Pharr resigned on July 12, 2007. A copy of an e-mail relating to Mr. Pharr's resignation is annexed as Exhibit "AE".

**Jonathan Thomas**

66. Mr. Thomas was a House Monitor at Flora Vista who was hired on February 1, 2005. He was interviewed and hired by me.

67. On or about June 2005, Mr. Thomas resigned due to his wife's health problems. A copy of his resignation letter is annexed as Exhibit "AF".

**Jose Pacheco**

68. Mr. Pacheco was hired by Palladia as House Monitor for Chelsea Court in October, 2002. He was interviewed and hired by me.

69. On January 30, 2006 Mr. Pacheco resigned effective January 31, 2006. A copy of his resignation e-mail is annexed as Exhibit "AG".

**Patrick Irby:**

70. Mr. Irby was hired in or about January, 2007 as a part time House Monitor at Chelsea Court. He was interviewed and hired by me.

71. In or about December, 2007, Mr. Irby was transferred to a full time position as a House Monitor at Stratford House, another Palladia facility. I recommended his full time hire to Edward J. Slepin, Program Director at Stratford House. A copy of Mr. Slepin's memorandum regarding this is annexed as Exhibit "AH".

**Robert Mathews**

72. Mr. Mathews was hired as a House Monitor at Chelsea Court on September 16, 2002. He was interviewed and hired by me.

73. Mr. Matthews works days as the Director of Operations for the

80048833.5                            13

Bowery Mission.

74. Mr. Mathews is still employed in the same position.

**Claude Nelson**

75. Mr. Nelson was hired as a House Monitor at Flora Vista in February, 2005. He was interviewed and hired by me.

76. Mr. Nelson is still employed in the same position.

**Kurtis Spivey**

77. Mr. Spivey was hired as a House Monitor at Flora Vista in October, 2005. He was interviewed and hired by me.

78. Mr. Spivey is still employed in the same position.

**Roscoe Clark:**

79. Mr. Clark was hired as a part time House Monitor at Dreitzer in or about April, 2006. He was interviewed and hired by me.

80. In or about July, 2006 he was transferred to Chelsea Court as a full time House Monitor and is presently a full time House Monitor at Dreitzer.

81. Mr. Clark is still employed in the same position.

**Nigel Garrett:**

82. Mr. Garret, a male, replaced Charles Williams as House Monitor at Dreitzer. He was interviewed and hired by me.

83. Mr. Garrett is still employed in the same position.

**Tagquan Travis:**

84. Mr. Travis was hired as a part time House Monitor at Dreitzer in or about August, 2007. He was interviewed and hired by me.

85.  Mr. Travis is still employed in the same position.

**Sam Dennis:**

86.  Sam Dennis was hired as a part time House Monitor at Chelsea Court in or about August, 2006. He was interviewed and hired by me.

87.  Mr. Dennis is still employed in the same position.

**John Pegram:**

88.  Mr. Pegram was hired as a part time House Monitor at Chelsea Court in or about February, 2008. He was interviewed and hired by me.

89.  Mr. Pegram is still employed in the same position.

90.  Clearly, Mr. Williams' allegations have no factual basis especially his allegation that he was terminated by me because of his sex. The facts conclusively prove that I hire men on a regular basis for House Monitor positions and hold no animus towards men. All actions I take regarding terminations are solely based on cause and performance.

91.  In attempting to buttress his case Mr. Williams, at his deposition stated that he didn't like the way other men were treated specifically mentioning Michael Williams, George Lino, the janitor and the super, although he was unable to point to any evidence to support his allegations other than his own "observations." ( Tr. 162-163)(Exhibit "AP")

92.  I don't know specifically what he is speaking about regarding the janitor and the super since I don't have any authority over them and both are hired and/or terminated by the property manager of Dreitzer who does not answer to me.

93.  As to Mr. Michael Williams I refer the Court to paragraphs 58-62

relating to Mr. Williams' hiring and termination. I should however, note that Mr. Williams was originally hired for a part time position and it was I, at his request, who promoted and transferred him to full time.

94.     Mr. Lino, was the Sr. Director of Human Resources, is a member of the senior staff and worked at Palladia's corporate headquarters. I have nothing to do with either the hiring or termination of Senior Staff which, I am advised, is handled at Palladia's executive level of Vice President or above. I had nothing to do with Mr. Lino's employment or his leaving Palladia.

**Allegations of Harassment:**

95.     There is also no evidence that I harassed Mr. Williams at all let alone because of his gender and his claims that I did so because he was trying to negotiate a raise are also unsupported by any evidence.

96.     I truly have no recollection of ever speaking to Mr. Williams regarding a raise nor does Mr. Williams have any evidence that he even spoke to me about it. Moreover, I certainly did not "harass" him because of it. Many employees request raises and I do not harass them for the request.

97.     I am advised that at his deposition Mr. Williams stated that the harassment he referred to were the incidents with the chair and his vacation. It should be noted that based upon his testimony that he was working a year before asking for a raise any such conversation would have occurred in October, 2006. The incidents that he references occurred in June and July, three months before he claims he even asked for a raise (Tr. 156-157)(Exhibit "AO").

80048833.5

16

**Coercion of other Female Employees:**

98. In his Complaint Mr. Williams' also alleges that I "coerced other female employees to lie about the incident."

99. I am advised that in his deposition (Tr. 163 – 166)(Exhibits "AQ" & "AR") Mr. Williams was specifically asked to identify any employee that I coerced to lie about the October 31, 2005 incident and the basis for his allegation. He was only able to identify Ms. Danowsky.

100. Moreover, he was able to offer no evidence that I in any way "coerced" Ms. Danowsky, only that the Administrative Law Judge who presided at the October 30, 2006 unemployment rehearing believed that her testimony at the second hearing was contradictory from her testimony at the first hearing and that she was unable to explain a discrepancy in the security log. A copy of that decision is annexed as Exhibit "AI".

101. I in no way coerced Ms. Danowsky into saying anything or testifying in any manner. Ms. Danowsky, in her affidavit, denies any such coercion. Just the fact that there were contradictions in her testimony does not constitute evidence that there was any coercion. Indeed, the fact that there were contradictions to her testimony at the various unemployment hearings prove that there was no coercion or that I asked her to lie.

102. Moreover, other than Mr. William's supposition and conclusion there is no evidence supporting this allegation.

**Mr. Williams Lacks Any Evidence of Discrimination:**

103. It is beyond dispute that Mr. Williams cannot produce any

80048833.5

17

evidence to support his allegations of gender discrimination of any kind.

106. Indeed, at the conclusion of his deposition he effectively admitted that no such evidence existed but that his claims were based solely upon supposition that men were transferred involuntarily and fired (Tr. 173 – 175) (Exhibit "AV"). Both the uncontrovered and documentary evidence makes short shrift of these conclusory and unsupported allegations.

105. There is no support for any claim that I discriminated against Mr. Williams because he was a male, that I harassed him or coerced any employee into lying so that I could terminate Mr. Williams. Simply put, Mr. Williams can produce no evidence that he was terminated for any reason other than for cause.

106. Accordingly, summary judgment should be granted and the Complaint dismissed.

WHEREFORE, it is respectfully requested that defendants' motion for summary judgment be granted and the complaint dismissed.

_____
Corinne Workman

Sworn to before me this
25 day of June, 2008

_____
Notary Public

NICOLE NICHELLE LOURENSZ
Notary Public - State of New York
NO. 01LO6033021
Qualified in Kings County
My Commission Expires 11-8-09

80048833.5                    18