UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

CHARLES WILLIAMS

        Plaintiff

                                        Docket No. 07 cv 7720
                                        (CM) (RLE)

              -against-                         **DEFENDANTS' LOCAL**
                                                    **RULE 56.1 STATEMENT**

PALLADIA, INC. and CORINE WORKMAN

                    Defendants

-------------------------------------------------------------x

        Defendants, Palladia, Inc. ("Palladia") and Corinne Workman ("Workman"), named herein as "Corine" Workman, submit this statement of material facts pursuant to Local Rule 56.1 to which defendants contend there are no genuine issues to be tried, in support of their motion for summary judgment.[1]

        1.      Palladia, established in 1970, is a not-for-profit corporation which offers a continuum of care to men and women recovering from substance abuse, co-occurring disorders and trauma. (Workman Aff. ¶ 7, Exhibit "H").

        2.      Ms. Workman was, during Mr. Williams's employment, and still is the Program Director of Palladia's facilities known as Dreitzer House, Flora Vista and Chelsea Court. (Workman Aff. ¶ 8)

        3.      Dreitzer House ("Dreitzer"), located in East Harlem is a supported

---

1 References to affidavits are designated as follows: Affidavit of Corinne Workman, Workman Aff. ¶, Affidavit of Lizzette Danowsky, Danowsky Aff. ¶, Affidavit of Doretha Gilmore, Gilmore Aff. ¶: The Deposition Transcript of Mr. Williams is designated as Tr.

80049377

living facility with one to three-bedroom apartments and is a permanent home for 36 families.  In addition to housing residents receive case management support services. (Workman Aff. ¶ 9)

4.    Flora Vista, also located in East Harlem, and right across from Dreitzer, is a six story building housing previously homeless and at-risk individuals. Tenants are offered long-awaited stability, security and support with full access to on-site case management and support services. (Workman Aff. ¶ 10)

5.    Chelsea Court, located in the Chelsea area of Manhattan is an 18-unit permanent housing project providing studio apartments for previously homeless individuals. (Workman Aff. ¶ 11)

6.    In or about September 15, 2005, Mr. Williams applied for a House Monitor position with Palladia.  (Workman Aff. ¶ 12, Exhibit "I")

7.    Mr. Williams was initially interviewed by Doretha Gilmore, the administrative assistant at the three facilities. (Workman Aff. ¶ 13).

8.    Mr. Williams was interviewed by Ms. Workman. (Workman Aff. ¶ 13)

9.    Mr. Workman  made the decision to hire Mr. Williams as a full time House Monitor to work the 12:00 a.m. to 8:00 a.m. shift at Dreitzer at an annual salary of $22,000.00 per year (Workman Aff. ¶ 14, Exhibit "J").

10.    At the time he was hired Mr. Williams received a copy of Palladia's Personnel Policy Manual and executed a document indicating that "I have read and fully understand the Personnel Policies of Palladia, Inc. I understand that if at any time I violate any of these policies, it will lead to my immediate termination." (Workman

80049377

Aff. ¶ 15, Exhibit "K")

11.    Mr. Williams position required him to man the front desk at Dreitzer's main entrance and provide security for the tenants. (Workman Aff. ¶ 16, Exhibit "L").

12.    Mr. Williams was also required to make security sweeps of the building during his shift. These sweeps require him to ride the elevators from the top to the bottom floor, stopping on every floor and looking out into the hallways. (Workman Aff. ¶ 16)

13.    Mr. Williams began working on or about October 17, 20045 on the 12:00 a.m. to 8:00 a.m. shift at Dreitzer. (Workman Aff. ¶ 16).

14.    On June 27, 2006, Mr. Williams was advised that he was not to use the desk in the Social Work office for his break as the Social Worker was complaining that she was finding his property on her desk. (Workman Aff. ¶ 19, Exhibit "M").

15.    Mr. Williams was also advised that his lunch break hours were from 3:30 a.m. to 4:30 a.m. and he was to take this time in the Activity Room. (Workman Aff. ¶ 19, Exhibit "M").

16.    Mr. Williams was advised that he was expected to be at the Front Desk at Dreitzer at all times. (Workman Aff. ¶ 19, Exhibit "M").

17.    On July 1st 2006, Mr. Williams called the administrative assistant at Dreitzer, Doretha Gilmore, advising her that he would not be at work that day as he was stuck in South Jersey and could not get back to cover his shift. (Workman Aff. ¶ 21, Tr. 67 –Exhibit "AJ")

18.    Mr. Williams admitted that he was aware that he did not have

3

permission to take that day off, but was in South Jersey and allegedly he could not come back (Workman Aff. ¶ 21,  Tr. 67)(Exhibit "AJ").

19.    On Tuesday, October 31, 2006  Mr. Williams was scheduled to work the 12:00 a.m. to 8:00 a.m. shift at Dreitzer. (Workman Aff. ¶ 23, Exhibit "O")

20.    According, to the time sheet and communications log[2] he came on duty at 12:00 a.m. (Workman Aff. ¶ 23, Exhibit "O").

21.    On October 31, 2006 Lizzette Danowsky, an employee of Palladia, who also worked for First Line Security was scheduled to be on duty at Flora Vista  for the 12:00 a.m. to 8:00 a.m. shift.  (Workman Aff. ¶ 24, Danowsky Aff. ¶ 2)

22.    Flora Vista is located directly across from Dreitzer and separated by a yard.  The person working security at Flora Vista has to pick up the keys to the building at Dreitzer. (Workman Aff. ¶ 10, 24, Danowsky Aff. ¶ 2, 3)

23.    At approximately 12:20 a.m. Ms. Danowsky went over to Dreitzer to pick up the keys. (Danowsky Aff. ¶ 3)

24.    Ms. Danowsky noticed that Mr. Williams was not sitting at the security desk although he was supposedly on duty.  (Danowsky Aff. ¶ 3)

25.    Ms. Danowsky waited a few minutes and checked the security book  observing that Mr. Williams had signed in as "on duty" at 12:00 a.m. (Workman Aff. ¶ 25, Danowsky Aff. ¶ 3, Exhibit "O")

26.    Seeing no one Ms. Danowsky signed the security log at 12:20 a.m. that she was on site and that "nobody @ D.H building was secure – quiet." Workman Aff. ¶ 26, Danowsky Aff. ¶ 4, Exhibit "O")

---

[2] The terms "communications log" and "security book" are used interchangeably by Palladia employees and refer to the same document.

80049377

27.     At 1:00 a.m. Ms. Danowsky performed a security sweep at Dreitzer checking all of the floors, bathrooms, staff offices and stairwell and could not find any sign of Mr. Williams. (Workman Aff. ¶ 27, Danowsky Aff. ¶ 5, Exhibit "O")

28.     Ms. Danowsky called Doretha Gilmore and advised her that Mr. Williams was not present and that Ms. Danowsky was unable to reach him on his cell phone.  (Workman Aff. ¶ 28, Danowsky Aff. ¶ 6, Gilmore Aff. ¶ 3)

29.     Ms. Gilmore directed Ms. Danowsky to stay at Dreitzer and recheck the facility and to have Mr. Williams call her when he returned to the building. (Danowsky Aff. ¶ 7, Gilmore Aff. ¶ 4)

30.     At about 2:00 a.m. Ms. Danowsky again checked the entire building and while not encountering Mr. Williams did see his back pack in one of the rooms (Danowsky Aff. ¶ 7).

31.     Ms. Danowsky saw Mr. Williams enter the building at 3:42 a.m. (Danowsky Aff. ¶ 7).

32.      Ms. Danowsky advised him to call Ms. Gilmore. (Danowsky Aff. ¶ 8).

33.     Ms. Danowsky memorialized the incident in a memorandum, dated November 3, 2006. (Danowsky Aff. ¶ 9, Exhibit "AW")

34.     Mr. Williams did not call Ms. Gilmore that night or the next day. (Gilmore Aff.  ¶ 9)

35.     When Ms. Workman arrived at work that morning she had a voice mail message from Doretha Gilmore regarding the issues with Mr. Williams that night (Workman Aff. ¶ 31, Gilmore Aff. ¶ 5).

5

80049377

36.     Upon reviewing the security log later that day Ms. Workman discovered that the security log had been changed where Ms. Danowsky had indicated that she entered Dreitzer at 12:20 – the log had been altered to show 1:00 (Workman Aff. ¶ 31, Exhibit "O").

37.     Ms. Workman left a message for Mr. Williams to come see her . (Workman Aff. ¶ 32).

38.     Mr. Williams did not come to see Ms. Workman. (Workman Aff. ¶ 32).

39.     When Mr. Williams called Ms. Workman he advised her that he didn't like the way she left instructions for him. (Workman Aff. ¶ 32)

40.     Ms. Workman suggested that Mr. Williams speak to someone in personnel (Workman Aff. ¶ 32).

41.     On November 1, 2006 Ms. Workman noticed that Mr. Williams had signed in for the night of November 1, 2006.  (Workman Aff. ¶ 34, Exhibit "P", Tr. 142-144 - Exhibit "AM")

42.     Mr. Williams had been informed when he arrived that he was not to work that night and to go to human resources that next day (Workman Aff. ¶ 34)

43.     The time sheet shows that Mr. Williams had signed in  for both Tuesday, October 31st (the night he left the facility) and the next day, Wednesday, November 1st a day he had not as yet worked (Workman Aff. ¶ 34, Exhibit "P", Tr.142-144 - Exhibit "AM").

44.     Mr. Williams admitted that the handwriting on the time sheet is his.( Tr. 142-144 - Exhibit "AM").

6

80049377

45.    Ms. Workman recommended to George Lino, . Director of Human Resources, that Mr. Williams be terminated. (Workman Aff. ¶ 37, Exhibit "Q")

46.    Mr. Williams termination was approved by Mr. Lino (Workman Aff. ¶ 38, Exhibit "R").

47.    The termination was pursuant to Palladia's Employee Manual which states that failure to comply with sign in procedures or falsification of timesheets is grounds for termination or immediate dismissal.  (Workman Aff. ¶ 39, Palladia Employee Manual § 12.2 (f) - Exhibit "S").

48.    Mr. Williams sent a letter, dated November 10, 2006 to Mr. Lino, denying that  he had falsified time sheets or any other documents and requested a hearing (Workman Aff. ¶ 40, Exhibit "T").

49.    By letter dated November 16, 2006, Mr. Lino, who is an African American male, advised Mr. Williams that he had reviewed the claim and found that "the information provided and the documents support the justification for your termination. (Workman Aff. ¶ 41, Exhibit "U").

50.    At present there are eight House Monitors between the three facilities all of which are men:  Roscoe Clark ( Chelsea Court); Sam Dennis (Chelsea – part time); Nigal Garret (Dreitzer) Robert Matthews (Chelsea Court); Claude Nelson (Flora Vista); John Pegram( Chelsea Court – part time); Kurtis Spivey (Flora Vista), Tagquan Travis (Dreitzer- part time). (Workman Aff. ¶ 49).

51.    Mr. Williams was not replaced by a woman. (Workman Aff. ¶ 5, 50).

52.    Nigel Garret, one of the House Monitor's at Dreitzer was hired as

Mr. Williams replacement. (Workman Aff. ¶ 50, 82).

53.    Mr. Garret was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 82).

54.    Mr. Williams admitted that he was replaced by a male. (Exhibit Tr. 74-75- Exhibit "AK")

55.    Sim Hartfield was hired by Palladia in April, 2005, as the House Monitor at Dreitzer. (Workman Aff. ¶ 52).

56.    Ms. Workman interviewed and hired Mr. Hartfield. (Workman Aff. ¶ 52)

57.    Mr. Hartfield was terminated by Ms. Workman in September 2005, for poor work performance during his probationary period. (Workman Aff. ¶ 53, Exhibits "V" and "W". )

58.    Mr. Hartfield was replaced by the plaintiff, Charles Williams. (Workman Aff. ¶ 54)

59.    Ramon Luna worked part time at Dreitzer as a House Monitor beginning, October 2005 (Workman Aff. ¶ 55)

60.    He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 55)

61.    Mr. Luna requested a full time position. (Workman Aff. ¶ 56)

62.    In February, 2006, Ms. Workman transferred Mr. Luna to Chelsea Court as a full time House Monitor. (Workman Aff. ¶ 56)

63.    On June 5, 2006, an unidentified woman called Palladia advising that Mr. Luna had left the country as a result of his father's death and that he had to fly to

8

the Dominican Republic.  (Workman Aff. ¶ 57)

64.    By June 14, 2006, Mr. Luna had not returned to work nor had he communicated with Palladia.  (Workman Aff. ¶ 57)

65.    By letter dated June 14th, Mr. Luna was advised that if Palladia did not hear from him by June 16th, he would be considered as having "abandoned" his position and would be terminated pursuant to Section 6.4 of Palladia's Employee Manual. ((Workman Aff. ¶ 57, 58 Exhibit "X", Exhibit "Z")

66.    As Palladia did not hear from Mr. Luna he was terminated for job abandonment.  (Workman Aff. ¶ 58 Exhibit "Y")

67.    Michael Williams, a male, was hired in October, 2005 as a part time House Monitor at Dreitzer.  (Workman Aff. ¶ 59)

68.    Mr. Williams was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 59)

69.    In or about May 1, 2006, at Mr. Williams request Ms. Workman transferred him to a full time position at Chelsea Court. (Workman Aff. ¶ 59)

70.    Pursuant to Section 4.3 of Palladia's Personnel Manual all new and present employees that are transferred to a new position have a six month probationary period. (Workman Aff. ¶ 60, Exhibit "AA")

71.    On August 30th and 31st during his probationary period, Mr. Williams failed to report for work without notifying his supervisor causing other staff to have to cover for him. (Workman Aff. ¶ 61, Exhibit "AB", Exhibit "AC" – Section 12.2 of Personnel Manual sub (f))

72.    By letter dated September 5, 2006, Mr. Williams was advised that

9

he was being terminated effective August 29, 2007. (Workman Aff. ¶ 63, Exhibit "AD").

73.     Harry Pharr, a male, replaced Roscoe Clark at Dreitzer after Mr. Clark was transferred to a full time position at Chelsea Court. (Workman Aff. ¶ 64)

74.     He was interviewed and hired by Ms. Workman(Workman Aff. ¶ 64)

75.     Mr. Pharr resigned on July 12, 2007. (Workman Aff. ¶ Exhibit "AE").

76.     Jonathan Thomas, a male,  was a House Monitor at Flora Vista who was hired on February 1, 2005.  (Workman Aff. ¶ 66)

77.     He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 66)

78.     On or about  June 2005, Mr. Thomas resigned due to his wife's health problems. (Workman Aff. ¶ 67, Exhibit "AF").

79.     Jose Pacheco, a male,  was hired by Palladia as  House Monitor for Chelsea Court in October, 2002 (Workman Aff. ¶ 68)

80.     . He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 68)

81.     On January 30, 2006 Mr. Pacheco resigned effective  January 31, 2006.  (Workman Aff. ¶ 69, Exhibit "AG").

82.     Patrick Irby, a male,  was hired in or about January, 2007 as a part time House Monitor at Chelsea Court. (Workman Aff. ¶ 70)

83.     He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 70)

80049377

84.    In or about December, 2007, Mr. Irby was transferred to a full time position as a House Monitor at Stratford House. (Workman Aff. ¶ 71 Exhibit "AH").

85.    Ms. Workman recommended his transfer to a full time position. (Workman Aff. ¶ 71 Exhibit "AH").

86.    Robert Mathew, a male, was hired as a House Monitor at Chelsea Court on September 16, 2002. (Workman Aff. ¶ 72)

87.    He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 72)

88.    Mr. Matthews works days as the Director of Operations for the Bowery Mission. (Workman Aff. ¶ 73)

89.    Mr. Mathews is still employed in the same position. (Workman Aff. ¶ 74)

90.    Claude Nelson, a male, was hired as a House Monitor at Flora Vista in February, 2005. (Workman Aff. ¶ 75)

91.    He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 75)

92.    Mr. Nelson is still employed in the same position. (Workman Aff. ¶ 76)

93.    Kurtis Spivey, a male, was hired as a House Monitor at Flora Vista in October, 2005. (Workman Aff. ¶ 77)

94.    He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 77)

95.    Mr. Spivey is still employed in the same position. (Workman Aff.

11

¶ 78)

96.    Roscoe Clark, a male, was hired as a part time House Monitor at Dreitzer in or about April, 2006. (Workman Aff. ¶ 79)

97.    He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 79)

98.    In or about July, 2006 he was transferred to Chelsea Court as a full time House Monitor. (Workman Aff. ¶ 80)

99.    Mr. Clerk is presently a full time House Monitor at Dreitzer. (Workman Aff. ¶ 80)

100.    Mr. Clark is still employed in the same position. (Workman Aff. ¶ 81)

101.    Nigel Garret, a male, replaced Charles Williams as House Monitor at Dreitzer. He was interviewed and hired by me.

102.    Mr. Garrett is still employed in the same position.

103.    Tagquan Travis, a male, was hired as a part time House Monitor at Dreitzer in or about August, 2007. (Workman Aff. ¶ 84)

104.    He was interviewed and hired by Ms. Workman. (Workman Aff. ¶ 84)

105.    Mr. Travis is still employed in the same position. (Workman Aff. ¶ 85)

106.    Sam Dennis, a male, was hired as a part time House Monitor at Chelsea Court in or about August, 2006. (Workman Aff. ¶ 86)

107.    He was interviewed and hired by Ms. Workman. (Workman Aff. ¶

12

86)

108.    Mr. Dennis is still employed in the same position. (Workman Aff. ¶ 87)

109.    John. Pegram, a male,  was hired as a part time House Monitor at Chelsea Court in or about February, 2008. (Workman Aff. ¶ 88)

110.     He was interviewed and hired by Ms. Workman (Workman Aff. ¶ 88)

111.    Mr. Pegram is still employed in the same position. (Workman Aff. ¶ 89)

112.    Ms. Workman was not responsible for either the hiring or termination of the janitor and super at Dreitzer. (Workman Aff. ¶ 92)

113.    The janitor and super at Dreitzer are hired or fired by the property manager at Dreitzer who does not answer to Ms. Workman (Workman Aff. ¶ 92)

114.    Ms. Workman was not responsible for either hiring or firing George Lino who is a member of Palladia's senior staff (Workman Aff. ¶ 94)

115.    Mr. Lino's employment was handled at the executive level of Vice President or above. (Workman Aff. ¶ 94)

116.    Ms. Workman has no recollection of Mr. Williams asking for a raise. (Workman Aff. ¶ 96)

117.    The incidents that Mr. Williams indicated constituted the harassment for asking for a raise occurred three months before he allegedly asked for a raise. (Workman Aff. ¶ 97, Tr. 156-15 -, Exhibit "AO")

118.    Mr. Williams identified only Lizzette Danowsky as the female

13

80049377

employee that he alleges Ms. Workman coerced to lie. (Tr. 163-166, Exhibits "AQ" & "AR".)

119.    Ms. Workman did not coerce Ms. Danowsky or anyone else to lie regarding the incident on October 31, 2006 relating to Mr. Williams. (Workman Aff. ¶ 101)

120.    Ms. Danowsky did not lie at the unemployment hearing. (Danowsky Aff. ¶ 10, 11)

121.    Ms. Danowsky was not coerced by Ms. Workman into lying regarding Mr. Williams. (Danowsky Aff. ¶ 11).

122.    Mr. Williams filed a Complaint of Discrimination with the New York State Division of Human Rights on January 9, 2007 alleging gender discrimination ( Spund Aff. ¶ 6, Exhibit "E")

123.    On or about March 8, 2007, the New York State Division of Human Rights issued a Determination and Order After Investigation dismissing the Complaint. ( Spund Aff. ¶ 8, Exhibit "F").

124.    The Determination found that that there was no evidence that Mr. Williams' "sex was a factor in how he was treated by the respondents or the respondent' termination of his employment. The investigation revealed that the respondent continued to employ other male House Monitors after the complainant was terminated." ( Spund Aff. ¶ 8, Exhibit "F")

14

80049377

Dated: Garden City, New York
      June 27, 2008

                          DAVIDOFF MALITO & HUTCHER LLP

                          By: _____

                                Mark E. Spund (MES 4705)
                          Attorneys for Defendants
                          200 Garden City Plaza, Suite 315
                          Garden City, New York 11530
                          (516) 248-6400

To:  Charles Williams
     Plaintiff pro se
     5 West 91st Street, # 5E
     New York, New York 10024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Index No. 07 CV 7720 (CM)(RLE)

===================================================

CHARLES WILLIAMS,

Plaintiff,

-against-

PALLADIA, INC. and CORINE WORKMAN,

Defendants.

===================================================

**DEFENDANTS' LOCAL RULE
56.1 STATEMENT**

===================================================

DAVIDOFF MALITO & HUTCHER LLP
Attorneys for Defendants
200 Garden City Plaza, Suite 315
Garden City, New York  11530
(516) 248-6400

80044078